Carol DOMENECH, Plaintiff,

v.

The CITY OF NEW YORK; David N. Dinkins, Mayor of the City of New York, Raymond Kelly, Police Commissioner of the City of New York; Deputy Chief Inspector Paul Sanderson; Captain Albert Giamonte, Captain Thomas Cavanaugh; Lieutenant Carmine Moschella; Lieutenant James Peters; Sergeant Craig Schroeder, and Sergeant Michael Ryan, Defendants.

No. 93 Civ. 4446 (RWS).

United States District Court, S.D. New York.

March 25, 1996.

Sharon Cerelle Konits, Hauppauge, NY, for Plaintiff.

Paul A. Crotty, Corporation Counsel of the City of New York, New York City (Todd Bromberg, of counsel), for Defendants.

## OPINION

SWEET, District Judge.

In this action brought under 42 U.S.C. § 1983, for violations of Plaintiff Carol Domenech's ("Domenech" or "Plaintiff") First Amendment rights to free speech and to petition the government for redress of grievances, Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

For the reasons set forth below, the motion will be granted in part and denied in part.

### Parties

Plaintiff Domenech is a Police Officer in the New York City Police Department ("NYPD"), and was assigned to the 94th Police Precinct (the "Precinct") at the time the complaint was filed.

The City of New York is a municipal corporation of the State of New York; defen-

dant David N. Dinkins ("the Mayor") was the Mayor of the City of New York at the time the complaint was filed; defendant Raymond Kelly ("the Commissioner") was the Police Commissioner of the City of New York at the time the complaint was filed (they are collectively referred to here as the "Municipal Defendants"). Defendant Paul Sanderson is a Deputy Chief Inspector of the NYPD; defendants Albert Giamonte and Thomas Cavanaugh are captains in the NYPD and were assigned to the Precinct; defendants Carmine Moschella and James Peters are lieutenants in the NYPD and were assigned to the Precinct; and defendants Craig Schroeder and Michael Ryan are sergeants in the NYPD and were assigned to the Precinct (collectively, the "Precinct Defendants").

### Prior Proceedings

Domenech originally filed this complaint on June 30, 1993. The Defendants answered on August 31, 1993; Domenech responded by filing an amended complaint on November 11, 1993, averring the current causes of action. On January 1, 1994, the Defendants answered the amended complaint. The Defendants' motion for summary judgment was filed on December 22, 1994, and Domenech filed an affidavit in opposition to Defendants' motion on April 12, 1995. After oral argument was adjourned several times by consent of the parties, and reply papers were submitted, the motion was deemed fully submitted and argued on February 7, 1996.

### Facts

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356,

89 L.Ed.2d 538 (1986). The facts presented here are construed accordingly.

On February 7, 1991, Domenech telephoned the NYPD's Office of Equal Employment Opportunity ("OEEO") claiming that a superior officer in her precinct house had given her a command discipline ("CD") for taking a day off improperly after having an "Emergency day" ("E-day") denied. Domenech told the OEEO Officer that she did not know why she had been denied an E-day, but stated that a male officer in the same precinct had been granted an E-day on the same day. The OEEO officer concluded that Domenech had failed to articulate a colorable claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, or the sexual harassment policy of the NYPD. Def.Ex. 1.

On February 26, 1991, Domenech filed a written complaint with the OEEO, claiming that she had been discriminated against on the basis of her sex by the issuance of the CD against her. Def.Ex. 2. Domenech alleged in her complaint that Giamonte, the Commanding Officer of the Precinct, had issued CDs to her and three other women in the precinct, while he had not issued CDs to any men. The OEEO officer investigated the Precinct's discipline log and found no evidence of disparate treatment of women officers. The officer concluded that there was no merit to Domenech's complaint. Def. Ex. 3.

Domenech claims that after filing her OEEO complaint, she was approached by Peters during an off-duty party. He told her that he really "liked her" and that she would never have to work on "foot post" if she left her husband. Domenech says that Peters apologized to her for his comments soon thereafter. Pl.Dep. at 83–85. She did not report this incident to any of the other defendants in this action. On August 25, 1991, Domenech received another CD for reporting late for duty; this CD was issued by Peters.

Schroeder began working with Domenech's squad in September 1991. Two weeks later, Domenech took a sick leave from duty, resuming work on January 1, 1992. Despite only working with her for two weeks, Schroeder subsequently gave Domenech a poor performance evaluation. Schroeder informed her that he had based his evaluation on what other "bosses," including Peters, had told him about Domenech. Amended Complaint at 7. In April 1992, Domenech was assigned to drive Sergeant Anthony Miranda (not a party to this action); at that time, Schroeder remarked to Sergeant Miranda that he should "watch" Domenech because she had made OEEO complaints. *Id.* at 8.

Domenech further complains that Moschella once stated to her, "You women are always in station houses—you fucking women," and that in December 1992, fellow police officers told her that if she ever called in as an "officer in trouble," nobody would respond. At about this time, Domenech approached Sanderson for advice about how to respond to these allegedly retaliatory actions; Sanderson merely advised her to "take the sergeant's test." *Id.* at 8–9.

After filing her original complaint on June 30, 1993, Domenech was subjected to allegedly retaliatory actions by the defendants, including the following: (1) while she was medically unable to work in August and September 1993, the NYPD refused to provide her with a department car to go to NYPD Health Services; (2) on August 5, 1993, she was served with disciplinary charges stemming from misconduct alleged to have occurred in December 1992, and for having an unauthorized beeper in June 1993; (3) defendants purposefully interfered with Domenech's child care schedule by requiring her to work afternoons and evenings at a location further from her home, and assigning her degrading and menial tasks. *Id.* at 21. However, when Domenech complained that she was being retaliated against for bringing this suit, defendants reassigned her to hours consistent with her child care obligations. *Id.*

*Discussion*

Although Domenech attempts to state three causes of action in her amended complaint, they are reducible to a discriminatory retaliation claim under the First Amendment and Section 1983. To the extent that she alleges violations of her right to equal protection, these alleged violations were merely the

events underlying her complaint of retaliatory actions. Both her memorandum of law and the statements of her counsel at oral argument make clear that Domenech is *not*, for the purposes of this lawsuit, bringing an equal protection claim based on sexual harassment or disparate treatment. See Pl's Memorandum of Law at 22.

## I. *The Precinct Defendants*

Domenech asserts her right under the First Amendment to seek redress of perceived grievances against persons exercising state governmental authority. She claims that she suffered adverse personnel decisions and was subjected to discrimination by the Precinct Defendants as a result of her filing of OEEO complaints and this action at law.

■ Under Section 1983 of Title 42 of the United States Code,

> every person who, under color of any statute, ordinance regulation, custom, or usage, or any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. ...

A plaintiff in a discrimination case bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This burden is not onerous. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Sweeney v. Research Foundation of State Univ.*, 711 F.2d 1179, 1185 (2d Cir.1983).

■ As stated above, a motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). "[T]he trial court's task at the summary judgment stage of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994). In the context of

alleged employment discrimination, because an intent to retaliate is rarely, if ever, disclosed by an employer, and because the defendants' state of mind and intent are placed in issue, summary judgment is ordinarily inappropriate. *Id.; see Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991).

### A. *Establishment of a Prima Facie Case*

■ To make out a *prima facie* case of discriminatory retaliation, an employee must show that (a) she engaged in protected activity; (b) her employer was aware of that activity; (c) she suffered adverse employment consequences; and (d) a causal connection exists between the protected activity and the adverse employment actions. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir.1992).

#### 1. *Protected Activity.*

■ A public employee who claims to have suffered for the exercise of her First Amendment rights must establish, "as an initial matter, that [her] speech may be 'fairly characterized as constituting speech on a matter of public concern,'" *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993) (quoting *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987)), *cert. denied,* —— U.S. ——, 114 S.Ct. 185, 126 L.Ed.2d 144, and thus constitutes protected activity.

■ In *Connick v. Myers* the Supreme Court stated that, "when an employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of a personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

If Domenech's complaints "implicated system-wide discrimination they would have unquestionably involved a matter of 'public concern.'" *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 143 (2d Cir.1993), *cert.*

*denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). The first question, then, is whether Domenech's OEEO complaints were meant to implicate system-wide discrimination, *see O'Malley v. New York City Transit Auth.,* 829 F.Supp. 50, 53 (E.D.N.Y. 1993), or whether she was merely trying to voice her personal concerns.

In *Saulpaugh v. Monroe Community Hosp.,* our Court of Appeals, in finding that the plaintiff failed to state a First Amendment claim, cited several cases involving a determination of whether a complainant had implicated "public concern." *Id.* Among those cases finding that the public interest was implicated are *Wilson v. UT Health Ctr.,* 973 F.2d 1263, 1266 (5th Cir.1992) (upholding a Section 1983 claim where the complaints concerned the routine use of sexually suggestive language by police officers toward all female officers and systemic instances of other forms of sexual harassment), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993); *Auriemma v. Rice,* 910 F.2d 1449, 1460 (7th Cir.1990) (*en banc*) (finding public concern where there was a "wholesale change in the highest police echelons allegedly only on a racial basis"), *cert. denied,* 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991).

On the other hand, no violation was found where the plaintiff's complaints were "personal in nature and generally related to her own situation." *Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir.) (holding that a medical resident's complaints about aspects of the residency program that negatively affected her did not implicate matters of public concern), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991).

In *Saulpaugh* itself, the Court found no First Amendment violation. The plaintiff in that case complained of repeated acts of sexual harassment by her supervisor directed toward her. 4 F.3d at 138–39. The Court concluded that:

> there [was] no indication that the plaintiff "wanted to debate issues of sex discrimination," that her suit sought "relief against pervasive or systemic misconduct by a public agency or public officials," or that her suit was "part of an overall effort ...

to correct allegedly unlawful practices or bring them to the public attention."

*Id.* at 143 (quoting *Yatvin v. Madison Metro. School Dist.,* 840 F.2d 412, 420 (7th Cir. 1988)).

The analysis in the instant case, then, turns on whether Domenech's complaints were "motivated by and dealt with her individual employment situation." *Saulpaugh,* 4 F.3d at 143. At the summary judgment stage, Domenech's complaints cannot be held to have been motivated solely by the conditions of her individual employment situation. In complaining about her treatment by fellow officers, Domenech explicitly claimed that she was discriminated against on the basis of her sex and informed the OEEO that three other women in her precinct had been similarly treated.

Moreover, the OEEO Officer investigated Domenech's complaints within her precinct, looking explicitly for evidence of past patterns of discrimination. Def.Ex. 2, 3. Although none were found, this does not affect Domenech's case; whether or not Domenech's allegations proved to be true is not at issue—this Court is not ruling on the substance of Domenech's claims which underlie her retaliation complaint. *Cf. Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989) (a retaliation claim under Title VII does not require a plaintiff to show an actual violation, but only that she was acting under a good faith, reasonable belief). Domenech has thus established the first element of a *prima facie* case of retaliation.

### 2. *Employer Awareness and Adverse Consequences*

■ The next two elements of a *prima facie* case of retaliation are whether the alleged retaliators knew that Domenech engaged in protected activity and whether she suffered adverse employment consequences. These elements are not seriously contested by these defendants. Domenech twice complained to the OEEO, and that body followed up her complaints by investigating within the Precinct. Construing the evidence in Domenech's favor, a genuine issue of material fact remains as to whether this investigation

brought Domenech's complaints to Defendants' attention.

The Defendants' knowledge of Domenech's complaints is evidenced by Schroeder's comment to Sergeant Miranda that he should "watch" Domenech because she had made OEEO complaints. Sanderson's advice to Domenech that she should "take the sergeant's test" could also be construed as an adverse action against her. When she sought advice from Sanderson regarding her problems with the other defendants, instead of helping her to initiate further complaints, he merely advised her to avoid the problem. It is arguable that a trier of fact could find that this advice, given instead of support and instructions, was Sanderson's way of ignoring Domenech's complaints in light of her OEEO action. Finally, the filing of this lawsuit drew further attention to Domenech's complaints.

. As to adverse consequences, the complaint alleges numerous retaliatory actions, including the NYPD's failure to provide transportation for Domenech to visit NYPD Health Services following an injury, disciplinary charges being filed against Domenech more than seven months after the charged misconduct, and purposeful interference with Domenech's child care needs. Amended Complaint at 21.

### 3. Causality

■ The last element of a *prima facie* retaliation complaint requires Domenech to show that she has presented a triable issue as to whether a causal connection exits between the protected activity and the adverse employment actions. *Kotcher*, 957 F.2d at 64. "Once the employee establishes that [s]he has spoken as a citizen on a matter of public concern, [s]he must also establish that that speech was at least a 'substantial' or 'motivating' factor in the discharge." *Id.* (quoting *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). A trier of fact could conclude, on the evidence offered by Domenech, that Domenech suffered adverse personnel actions as a result of her complaints to the OEEO and the filing of this lawsuit.

A plaintiff may establish the causation element of a retaliation case in several ways.

One way is to show temporal proximity between the protected conduct and the alleged retaliatory action. *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986). Domenech claims that she was subjected to numerous personnel actions following closely on the heels of the filing of this lawsuit; such actions within two months of the filing of the lawsuit could allow a reasonable trier of fact to infer a causal connection.

Another method of showing causation is direct evidence of retaliatory animus. *DeCintio,* 821 F.2d at 115. Domenech has alleged that she was subjected to negative comments from her peers and superiors in the police department following her OEEO complaints. These include Schroeder's remark that Domenech should be "watched" because she had made OEEO complaints, and several officers' statements that nobody would respond if Domenech called in as an officer in trouble. Amended complaint at 8–9.

### B. Burden on Defendants to Rebut Prima Facie Case

■ As Domenech has established (for the purposes of this motion) a *prima facie* case, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse personnel actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972). While the *McDonnell Douglas* test was articulated in, and traditionally applies to, the context of Title VII claims, the Supreme Court has been willing to extend it to Section 1983 claims. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 n. 1, 113 S.Ct. 2742, 2747 n. 1, 125 L.Ed.2d 407 (1993) (applying the *McDonnell Douglas* framework to racial-discrimination-in-employment claims under Section 1983); *cf. Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989) (applying framework to claims under 42 U.S.C. § 1981).

In the instant case, Defendants do not attempt to articulate a legitimate, nondiscriminatory reason for the adverse personnel actions against Domenech. Rather, they attempt to foreclose the entire issue by denying that Domenech established a *prima facie* employment discrimination case in the first place. This Court, however, has already concluded that Domenech's allegations make out a *prima facie* Section 1983 complaint. Defendants' failure to rebut Domenech's case obviates the need to consider the third prong of the *McDonnell Douglas* test: whether Domenech can present an issue of material fact that the articulated reason for the adverse personnel actions is merely pretextual.

For the reasons stated above, summary judgment will not be granted at this time in favor of the Precinct Defendants.

## II. *The Municipal Defendants*

The elements of a *prima facie* retaliation case against the Municipal Defendants are identical to the elements of the case against the Precinct Defendants. As applied to the Municipal Defendants, the analysis of whether Domenech engaged in protected activity and whether she suffered adverse employment consequences does not differ from the analysis applied to the other class of defendants.

With respect to the required showings of employer awareness of plaintiff's protected activity, and causality between the protected activity and the adverse employment actions, the acts and omissions of the Municipal Defendants must be considered in light of *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Municipal Defendants may not be held liable solely on the basis of a *respondeat superior* theory. *Id.* at 691, 694, 98 S.Ct. at 2036, 2037; *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir.1991). *Monell* requires that Domenech show, as to these defendants, "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Ricciuti*, 941 F.2d at 122.

At the threshold, however, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to Section 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–130, 108 S.Ct. 915, 932, 99 L.Ed.2d 107 (1985) (plurality opinion) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality opinion)). Whether a municipal official has "final policymaking authority" is a question of state law for the trial judge to determine. *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 736, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (adopting the logic of the *Praprotnik* plurality).

In the Supreme Court case of *City of St. Louis v. Praprotnik*, the municipal defendant did not have an express policy regarding the use of retaliatory personnel policies. Although here the City of New York has an express non-discrimination policy, this does not end the inquiry. A prevalent custom of failure to comply with a municipality's non-discrimination policies may itself demonstrate a municipal custom, or that a city's actual policies differ from those it has announced. *Praprotnik*, 485 U.S. at 128–32, 108 S.Ct. at 928. As the Supreme Court said in *Praprotnik*:

> We nowhere say or imply, for example, that "a municipal charter's precatory admonition against discrimination or any other employment practice not based on merit and fitness effectively insulates the municipality from any liability based on acts inconsistent with that policy." Rather, we would respect the decisions, embodied in state and local law, that allocate policymaking authority among particular individuals and bodies. Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced.

*Id.* (quoting Justice Brennan's *Praprotnik* concurrence, 485 U.S. at 131, 108 S.Ct. at 935). In *Jett* the Supreme Court emphasized that, "[o]nce those officials who have the

power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of the rights at issue ..." 491 U.S. at 737, 109 S.Ct. at 2724.

■ In the instant case, the Police Commissioner and the Mayor may be liable under a *Monell* claim as final policymakers with respect to retaliatory action within the NYPD.[1] *Monell* and its progeny clearly establish that the liability of the municipality depends on the liability of its officials with final policymaking authority in this area. *Monell*, 436 U.S. at 690, 694, 98 S.Ct. at 2035, 2037; *see, e.g., Pembaur*, 475 U.S. at 478–479, 106 S.Ct. at 1297–98; *Ricciuti*, 941 F.2d at 122–123.

It is incumbent upon the Plaintiff, however, to demonstrate a custom or practice of the police department sufficient to subject the Municipal Defendants to liability. To prove the existence of a policy or custom, a plaintiff must establish one of the following: (1) a formal policy, officially promulgated or adopted by the Police Department, caused a violation of her constitutional rights; (2) an official with final policy-making authority violated her constitutional rights; (3) the existence of an unlawful practice by subordinate police officers violated her rights, and this practice was so manifest as to imply the constructive acquiescence of policy-making officials; or (4) liability based on a failure to train or supervise, such failure amounting to "deliberate indifference" on the part of the defendants. *Praprotnik*, 485 U.S. at 127–30, 108 S.Ct. at 926–28; *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir.1982).

Domenech alleges neither that a formal policy of the Police Department caused a violation of her First Amendment rights, nor that an official with final policy-making authority violated her constitutional rights. She must therefore show that a policy or custom of the City or Police Department, or a failure to train or supervise her colleagues in the Police Department, caused the deprivation of her First Amendment rights. *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36.

## A. *The Failure to Train or Supervise*

Domenech alleges that the liability of the Municipal Defendants may be based on a claim of failure to train or supervise municipal employees "amount[ing] to deliberate indifference to the rights of those with whom municipal employees will come into contact." *City of Canton v. Harris*, 489 U.S. at 388, 109 S.Ct. at 1204.

Domenech, however, merely asserts that "there was such a failure to train and supervise" as to satisfy the criteria of *City of Canton*. She offers no evidence supporting her assertions that the Police Department has failed to properly train or supervise its officers. Moreover, she fails to even assert that any such failure to train or supervise NYPD officers gives rise to a constructive presumption that municipal officers in charge of policymaking were deliberately indifferent to potential rights violations. Finally, she fails to identify the particular training deficiencies giving rise to a deprivation of her rights.

Accordingly, Domenech has failed to present a genuine issue of material fact with

---

1. As to the Police Commissioner, the New York City Charter deems the Police Commissioner the head of the Police Department. *See* N.Y. City Charter § 431. Additionally, the Charter provides that the "Commissioner shall have cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department," and that the "Commissioner shall be the chief executive ... chargeable with and responsible for the execution of all laws and the rules and regulations of the department." *Id.* §§ 433(a), 434.

The defendants argue that the New York City Personnel Director has final policymaking authority over personnel matters, thereby preclud-

ing liability for the Police Commissioner on a *Monell* claim. Def's Memorandum of Law at 11–12. However, the matter at hand involves an alleged retaliatory action, not personnel policy. Personnel policy, defined by the City Charter, involves hiring, firing and promotion of city employees. N.Y. City Charter § 813.

While the Police Commissioner may not be the final policymaker for the City in the area of personnel administration, he could be deemed the final policymaker in the realm of retaliatory action within the police department.

Similarly, the New York City Charter vests general authority to make final policy for the City in the Mayor and the City Council. See N.Y. City Charter §§ 3, 8a, 21, 28.

respect to her claim that the Municipal Defendants abrogated her rights by failing to properly train or supervise their employees.

### B. *Pervasive Custom or Practice of Municipal Employees*

Domenech also alleges liability of the Municipal Defendants based on a "multi-decade-long practice so well-settled as to constitute a 'custom or usage' so manifest as to imply the constructive acquiescence of policy-making officials." Pl.Opposing Mem. of Law at 3. *See Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1985) (to prevail on this theory a plaintiff must prove "the existence of a widespread practice that ... is so prominent and well-settled as to constitute a 'custom or usage' with the force of law"); *see also Sorlucco v. New York City Police Dept.,* 971 F.2d 864, 871 (2d Cir.1992).

Domenech supports her claim by pointing to the existence within the ranks of the NYPD of a "Blue Wall of Silence," which allegedly demands retaliation against police officers who complain about the conduct of fellow officers. Pl.Opposing Mem. of Law at 3–4. According to Domenech, this retaliation often leads to the dismissal or ongoing harassment of complaining officers.

To prove the existence of this retaliatory custom or practice, Domenech relies upon: (1) the report of the New York City Commission to Investigate Allegations of Police Corruption and the Anti–Corruption Procedures of the Police Department (the "Mollen Commission"), dated July 7, 1994 (Pl's Ex. B); (2) selected portions of the transcripts of the public hearings held by the Mollen Commission in 1993 (Pl's Ex. C); and (3) copies of photographs of graffiti in restrooms at the 75th and 90th Precinct houses, illustrating that certain officers have been branded "rats" by their fellow officers (Pl's Ex. D, E).

The evidence of graffiti presented by Domenech may be disposed of initially, for it fails to establish a pervasive custom or practice of municipal employees, even if viewed in the light most favorable to Domenech.

Defendants raise evidentiary objections to consideration of the Mollen Commission report and the testimony before the Mollen Commission. It is unnecessary to pass on these objections, however, because, even if

fully considered, the Report fails to create a genuine issue of material fact as to the existence of a retaliatory custom or practice. The Mollen Commission Report did indeed find a culture of retaliation against those reporting criminal corruption within the NYPD, and some testimony was presented to suggest the existence of a "Blue Wall of Silence" within the Department. Even construing the Mollen Commission Report in its most favorable light, however, no reasonable finder of fact could deem it to demonstrate a culture of retaliation for non-criminal activity such as discrimination complaints so pervasive as to constitute a custom or usage amounting to tacit NYPD policy. Thus, Domenech has failed to establish a genuine issue of material fact as to the culpability of the Municipal Defendants under the *Monell* standard.

For the reasons stated above, summary judgment will be granted in favor of the Municipal Defendants.

### *Conclusion*

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. Specifically, summary judgment is granted dismissing the claims against the Municipal Defendants, and summary judgment is denied as to the Precinct Defendants.

It is so ordered.