Elissa Bon SETTECASE, Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Larry Rosenshein, and George J. Marlin, Defendants.

No. 96 CIV. 7008(LLS).

United States District Court, S.D. New York.

July 21, 1998.

John A. Beranbaum, New York, NY, for Plaintiff; Michael Paley, John A. Beranbaum, of counsel.

Milton H. Pachter, The Port Authority of New York and New Jersey, New York, NY, for Defendants; Megan Lee, of counsel.

## Opinion and Order

STANTON, District Judge.

Defendants Port Authority of New York and New Jersey ("Port Authority") and Larry Rosenshein move for summary judgment dismissing plaintiff Elissa Bon Settecase's amended complaint. Plaintiff alleges retaliation and sex and disability discrimination in

violation of various federal, state and local laws.

### Background

After graduating from law school, plaintiff began working at the Port Authority on October 15, 1985 as a Staff Assistant (a junior management position) in its World Trade Institute ("WTI").[1] (Consent Pre–Trial Order Agreed Fact ¶¶ 1, 3; Settecase Dep. at 13–14; Anders Aff. ¶ 9.) While at WTI, Settecase says she "had a high level of responsibility and managed numerous projects. My responsibilities included in-depth research and analysis in the area of world trade, creating, organizing and running special programs and seminars, and marketing and conducting an institute-wide quality assurance audit." (Settecase Aff. ¶ 3.) She asserts, without challenge from defendants, that she received favorable evaluations while at WTI and that her supervisors there recommended her for promotion in 1993 and 1994. (*Id.* ¶ 4.) She never received that promotion.

Beginning in 1990, Settecase took many medical leaves of absence for pregnancy-related reasons. Between 1990 and mid–1993, she "took approximately six sick leaves, in accordance with the Port Authority's medical leave policy, in connection with three miscarriages, two hysteroscopies and an ectopic pregnancy." (*Id.* ¶ 5.) She took two five-week leaves in the fall of 1993 and 1994 for unsuccessful in vitro fertilization procedures. (*Id.*)

Shortly after she returned from the second leave, Lorrie Foster, the director of WTI, and Larry Rosenshein, Director of the Office of International Business ("OIB"), told Settecase that she was being transferred to Global Infrastructure Advisors ("GIA"), a newly-created unit of OIB. (*Id.* ¶ 8.) Settecase claims that "Foster described this move to me in a negative light." (*Id.*) Settecase "immediately expressed to Rosenshein that I was concerned about the effect of the transfer on the vesting of my benefits and on my job security at the Port Authority" and about "being transferred from a manager's window office to a secretary's cubicle."[2] (*Id.* ¶ 11.)

---

1. Settecase never worked as an attorney at the Port Authority.

2. Defendants respond that at the time GIA was created plaintiff and her colleague, Richard Da-

Rosenshein "made light of these concerns" and promised her increased responsibility. (*Id.*) Nevertheless, "After the transfer, despite my professional background, more than nine years experience at the Port Authority and my law degree, I was given only clerical responsibilities, including designing stationery and business cards, faxing, xeroxing, typing, and setting up charge codes." (*Id* ¶ 12.)

GIA consisted of Joseph McNamara, its manager, Richard Danoff, its marketing manager,[3] Tony Gomes, a temporary employee, Julia Melton, a secretary, and plaintiff, an administrator. Settecase asserts that Rosenshein "treated me unfairly" compared to Danoff:

> Even though Danoff did not have a law degree, had worked for the Port Authority for only about two years, and had the same pay grade as I did, he was given a great deal of responsibility to meet with potential clients, draft business contracts, attend marketing and senior staff meetings, and to market Port Authority services. Danoff also received a more private manager's office space than I did. Rosenshein was responsible for this unequal division of responsibility.

(*Id.* ¶ 14.) She claims that Rosenshein treated her "in a rude and demeaning manner and closely monitored" her (*id.* ¶ 13) and berated her for "gossiping" with a male colleague while he did not berate the male colleague (*id.* ¶ 15). Rosenshein answers that he did reproach her colleague. (Rosenshein Aff. ¶ 11.)

In January 1995 plaintiff complained about Rosenshein to the head of Port Authority's Office of Equal Employment Opportunity ("EEO"), who advised her to put her complaint in writing. Settecase submitted an eight-page complaint dated January 9, 1995, in which she described a history of unfair treatment by Rosenshein. (Defs.' Notice of

Motion Ex. E.) After Rosenshein received a copy of that complaint, she alleges, he negatively interfered with her performance review, failed to increase her responsibilities, screamed at her in her colleagues' presence and excluded her from meetings attended by McNamara, Danoff and Gomes. (Settecase Aff. ¶ 19.)

Plaintiff was terminated in October 1995 as part of a reduction in force ("RIF"). In September 1995 the Port Authority was restructuring its operations, and in doing so, decided "to eliminate the functions currently being performed by the XPORT Trading Company and by Global Infrastructure Advisors. Further, the World Trade Institute, while not being eliminated at this time, had been identified for privatization in the near future." (Barrone Aff. ¶ 13.) Lillian Barrone, Director of the Port Commerce Department,[4] says she related the above information to Rosenshein to aid him in recommending positions for elimination. She instructed him that "recommendations should take into account the minimal number of positions that would be needed at the World Trade Institute to continue the teaching and contractual obligations that were outstanding pending transfer of the World Trade Institute to a private entity." (*Id.* ¶ 13; Rosenshein Aff. ¶ 17.)

Rosenshein accordingly recommended the termination of Settecase, McNamara, Melton and all but three XPORT employees (for whom he gave specific reasons for retaining).[5] (Rosenshein Aff. ¶ 19; Defs.' Notice of Motion Exs. I, J.) Though the Port Authority decided to retain McNamara for the time being (he left "approximately four months later in connection with a subsequent downsizing"), Rosenshein did not play a role in that decision. (Barrone Aff. ¶¶ 16–17; Rosenshein Aff. ¶¶ 18–19, 26.) Rosenshein asserts that "Danoff was not terminated be-

noff, "were assigned to existing, interior office modules of comparable size." (Anders Aff. ¶ 13.)

3. Plaintiff describes Danoff as an administrator (Settecase Aff. ¶ 10), while Rosenshein says Danoff's title was "Marketing Manager" and plaintiff's title was "Staff Administrator" (Rosenshein Aff. ¶ 6).

4. During the restructuring, OIB—formerly an independent office—became a division within the newly-created Port Commerce Department. (Barrone Aff. ¶¶ 8–10.)

5. Rosenshein says Gomes, the temporary employee, was kept on for about three or four weeks after the RIF. (Rosenshein Dep. at 182–184, Paley Aff. Ex. C.)

cause an open position for someone with his background and credentials existed in a unit, which was not being eliminated and would continue to operate." (Rosenshein Aff. ¶ 24.) Settecase could not have been similarly accommodated, he claims, "because all open positions, as well as filled positions, were eliminated in her former unit, the World Trade Institute" and because "she didn't fit" with positions in other units. (*Id.;* Rosenshein Dep. at 169, Paley Aff. Ex. C.)

Settecase now claims that Port Authority and Rosenshein

(1) discriminated against her because of

    (a) her gender, in violation of the equal protection clause of the Fourteenth Amendment; 42 U.S.C. § 1983; 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the New York State Human Rights Law ("State HRL"), N.Y. Exec. Law § 290, *et seq.;* and the New York City Human Rights Law ("City HRL"), Admin. Code of the City of New York § 8–101, *et seq.;* and

    (b) her disability (infertility), in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* and the State and City HRL; and

(2) retaliated against her in violation of the First Amendment; Title VII; and the State and City HRL.

### Discussion

I.  *Timeliness, and Non–Application of the New York State HRL*

■ Defendants argue that plaintiff's Title VII and ADA claims are time barred because she did not file her claim with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged violation. Plaintiff responds that she had 300 days to file her claim.

Under Title VII and the ADA, a victim of discrimination must file her claim within 180 days of the alleged violation unless she has first filed a charge with an appropriate state agency, in which case she has the earlier of

300 days from the date of the alleged violation or 30 days "after receiving notice that the State or local agency has terminated the proceedings under the State or local law." 42 U.S.C. § 2000e–5(e)(1) (Title VII); 42 U.S.C. § 12117(a) (ADA) ("The powers, remedies, and procedures set forth in section[ ] 2000e–5 . . . of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment."). Since plaintiff was terminated on September 15, 1995, and she filed her complaint with the EEOC on July 3, 1996 (more than 180 but less than 300 days later), her EEOC complaint appears untimely under the language of the statute.

The EEOC regulations, however, allow 300 days for filing a complaint in a state where the state or local agency handling employment discrimination claims has subject matter jurisdiction over the grievant's claims, regardless of whether the claimant has first filed a claim with the state agency. 29 C.F.R. § 1601.13(a)(4)(ii)(A); *see generally Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 305 (2d Cir.1996) (noting that "the 300–day rule is qualified in ways that bedevil lawyers as well as laypersons" and explaining application of the timing rules); *McGuirk v. Eastern General Ins. Agency*, 997 F.Supp. 395 (W.D.N.Y.1998) (same). If the state does not have an agency that hears employment discrimination complaints, or if it does have such an agency but that agency does not have subject matter jurisdiction over the claims at issue, then the claimant must file her complaint with the EEOC within 180 days of the alleged violation:

A jurisdiction having a FEP agency[6] without subject matter jurisdiction over a charge (e.g., an agency which does not cover sex discrimination or does not cover nonprofit organizations) is equivalent to a jurisdiction having no FEP agency. Charges over which a FEP agency has no

---

**6.** The Code of Federal Regulations states: "the term *FEP agency* shall mean a State or local agency which the Commission has determined

satisfies the criteria stated in section 706(b) of title VII [42 U.S.C. § 2000e–5(c)]." 29 C.F.R. § 1601.3(a).

subject matter jurisdiction are filed with the Commission upon receipt and are timely filed if received by the Commission within 180 days from the date of the alleged violation.

29 C.F.R. § 1601.13(a)(2). There is no dispute that the New York State Division of Human Rights ("DHR") is a FEP agency. Thus, if the DHR has jurisdiction over discrimination claims against the Port Authority, plaintiff had 300 days to file her complaint with the EEOC, and her claim is timely; if not, she had only 180 days, and it is untimely.

Whether the DHR has subject matter jurisdiction depends on whether the DHR has the ability to hear employment discrimination claims against Port Authority, which in turn depends on whether the Human Rights Law applies to the Port Authority, since the DHR can only enforce New York (not federal) anti-discrimination laws.

"The Port Authority is a bi-state agency created by compact in 1921 between the States of New York and New Jersey with the consent of the Congress of the United States." (Defs.' Rule 56.1 Statement ¶ 1.)

> Bistate entities ... typically are creations of three discrete sovereigns: two States and the federal government. Their mission is to address interests and problems that do not coincide nicely either with the national boundaries or with State lines—interests that may be badly served or not served at all by the ordinary channels of National or State political action.

*Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 400, 130 L.Ed.2d 245 (holding Port Authority not entitled to Eleventh Amendment immunity) (internal citations and quotations omitted). Because it is the joint creation of two states, a bistate agency is not necessarily subject to all laws of its creator states.

The applicability of New York and New Jersey state laws to the Port Authority is governed by the Port Authority compact, which provides: "The Port Authority shall have such additional powers and duties as may hereafter be delegated to or imposed upon it from time to time by the action of the legislature of either state concurred in by the legislature of the other." Compact art. VII

(codified at N.Y. Unconsol. Law § 6408). The dispute in this case centers on the meaning of "concurred." New York, through its Human Rights Law, and New Jersey, through its Law Against Discrimination ("LAD"), have enacted legislation that prohibits discrimination in employment. Plaintiff argues that because those laws are similar, New York and New Jersey have each concurred in the legislation of the other. Defendants take a narrower approach, arguing that "both states need to expressly agree that legislation is intended to apply to the Port Authority." (Defs.' Reply Mem. at 11.)

The term "concur" is defined as "to act together to a common end or single effect," Webster's Ninth New Collegiate Dictionary 273 (1985), and "To agree; accord; act together; consent," Black's Law Dictionary 263 (5th ed.1979); it implies bilateral action. According to those definitions, a state would not likely be said to have concurred in legislation by the other simply because it happened to enact legislation similar in language and effect. Concurrence implies an intent to act jointly.

New York and New Jersey have not expressly concurred in each other's anti-discrimination laws. Both states seem to require express language when enacting legislation governing the Port Authority. Indeed, each state has expressed in its legislation regulating the Port Authority that it would take effect only upon enactment by the other state of identical legislation. *See, e.g.,* N.Y. Unconsol. Law § 6647 ("This act shall take effect upon the enactment into law by the state of New Jersey of legislation having an identical effect with sections one to fourteen, inclusive, of this act; but if the state of New Jersey shall have already enacted such legislation, then this act shall take effect immediately."); N.J. Stat. Ann. § 32:1–35.17 ("This act shall take effect upon the enactment into law by the State of New York of legislation having an identical effect with sections one to fourteen, inclusive, of this act; but if the State of New York shall have already enacted such legislation, then this act shall take effect

immediately.").[7] No such language appears in either the HRL or LAD.

Most courts addressing this question have held that the Port Authority is not subject to the New York State HRL or the New Jersey LAD. *Baron v. Port Auth. of New York and New Jersey,* 968 F.Supp. 924 (S.D.N.Y.1997) (holding plaintiff had only 180 days to file complaint with EEOC because DHR did not have jurisdiction over discrimination claims against the Port Authority); *King v. Port Auth. of New York and New Jersey,* 909 F.Supp. 938 (D.N.J.1995), *aff'd,* 106 F.3d 385 (3d Cir.1996); *Bailey v. Port Auth. of New York and New Jersey,* Index No. 40149/92 (N.Y. Sup.Ct., N.Y. County May 3, 1994), *aff'd,* 216 A.D.2d 42, 627 N.Y.S.2d 921 (1st Dep't 1995) (appended as Ex. 1 to Defs.' Mem. of Law). In *Baron,* the court reasoned that neither the HRL nor the LAD applies to the Port Authority because there is no evidence that the legislature of either state so considered or intended:

> The absence from the text and legislative history of Human Rights Law and LAD of any mention of [the Port Authority], in addition to the absence of an express statement by either state legislature that it was amending or supplementing the provisions of the Compact and that the law would take effect upon the enactment of identical legislation in the opposite state, seems to indicate that neither New York nor New Jersey legislatures intended the laws to apply to the internal operations of [the Port Authority].

*Baron,* 968 F.Supp. at 929 (citing *Malverty v. Waterfront Comm'n of New York Harbor,* 71 N.Y.2d 977, 529 N.Y.S.2d 67, 524 N.E.2d 421 (1988)). Moreover, the DHR has ruled at least twice that it does not have jurisdiction over the Port Authority. *See Frank v. Port Auth. of New York and New Jersey,* Case Nos. 1a–E–A–80–71767 (State Division of Human Rights Sept. 12, 1980); *Ramos v. Port Auth. of New York and New Jersey,* Case No. GCS–728–74, GCS–33373–74 (State Division of Human Rights June 28, 1974)

(both appended as Ex. 1 to Defs.' Reply Mem.).

By contrast, the New Jersey Supreme Court has held that parallel legislation in New York and New Jersey does apply to the Port Authority. *Bunk v. Port Auth. of New York and New Jersey,* 144 N.J. 176, 676 A.2d 118 (1996) (holding New Jersey worker's compensation law applicable to Port Authority employee). The New Jersey Supreme Court based its decisions on a "parallelism" theory: "The corollary of the proposition that neither state may unilaterally impose its legislative will on the bi-state agency is that the agency may be subject to complementary or parallel state legislation." *Bunk,* 144 N.J. at 184, 676 A.2d at 122.

While the New Jersey view may be practical, the fact remains that New York, through its courts and the DHR, has taken the position that the HRL does not apply to the Port Authority and that the DHR, therefore, does not have jurisdiction over claims against the Port Authority. The present record contains no evidence that either state intended its anti-discrimination laws to apply to the Port Authority. If New York and New Jersey intend their own anti-discrimination laws to apply to the Port Authority, they have the means to do so clearly and expressly, as they have done for other laws.

Since the HRL does not apply to the Port Authority, the DHR does not have subject matter jurisdiction over it, and plaintiff had only 180 days to file her claim with the EEOC. Her federal claims under Title VII and the ADA, filed more than 180 days after the alleged violation, are thus untimely.

## II. *Remaining Claims under the State and City Human Rights Law*

■ The above holding requires dismissal of plaintiff's claims under the State HRL. Furthermore, for the above reasons and because the compact does not allow for unilateral municipal legislation, New York City cannot unilaterally impose its HRL on the Port Authority.[8] *Cf. Levy v. City Comm'n*

---

7. The "act" mentioned in both statutes regulates air terminals within the Port Authority's jurisdiction. *See* N.Y. Unconsol. Law §§ 6631–6647 and N.J. Stat. Ann. §§ 32:1–35.1 to 32:1–35.17.

8. The cases plaintiff cites are inapposite because they hold that New York State agencies are subject to the City HRL. Since the Port Authority is a bistate agency whose liability under state law is

*on Human Rights,* 85 N.Y.2d 740, 746, 628 N.Y.S.2d 245, 249, 651 N.E.2d 1264 (1995) ("The City's adoption of local laws on human rights is a valid exercise of the City's broad police power, which, we have said, is restricted to the extent that the local law may not be inconsistent with general law and may not intrude into an area which the legislature has preempted."). Accordingly, her claims under the State and City Human Rights Law are dismissed.

### III. *First Amendment Claim*

Plaintiff claims that, in violation of the First Amendment, "Defendants retaliated against [her] for having made complaints about discriminatory work practices," and for having filed "a written complaint of sex discrimination with the Port Authority's Equal Employment Opportunity office." (Amended Compl. ¶¶ 34, 38 .)

■ "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* 461 U.S. at 147–148, 103 S.Ct. at 1690. "The fundamental question is whether the employee is seeking to vindicate personal interests or to bring to light 'a matter of political, social, or other concern to the community.'" *Rao v. New York City Health and Hospitals Corp.,* 905 F.Supp. 1236, 1243 (S.D.N.Y.1995) (quoting *Connick,* 461 U.S. at 146–148, 103 S.Ct. at 1689–90). Where an employee's complaints "implicated system-wide discrimination they would have unquestionably involved a matter of 'public concern.'" *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 143 (2d Cir. 1993). A First Amendment claim fails, however, where the employee's complaints "were

expressly limited by its compact, its liability is

motivated by and dealt with her individual employment situation." *Id.*

Matters of public concern include situations where "the plaintiff 'wanted to debate issues of sex discrimination,' [where] her suit sought 'relief against pervasive or systemic misconduct by a public agency or public officials,' or [where] her suit was 'part of an overall effort ... to correct allegedly unlawful practices or bring them to the public attention.'" *Id.* 4 F.3d at 143 (quoting *Yatvin v. Madison Metro. Sch. Dist.,* 840 F.2d 412, 420 (7th Cir.1988)) (alteration in original). *Compare Domenech v. City of New York,* 919 F.Supp. 702, 707 (S.D.N.Y.1996) (speech addressed matter of public concern where plaintiff complained of sex discrimination against her and three female co-workers), *and Scott v. Goodman,* 961 F.Supp. 424, 434–436 (E.D.N.Y.1997) (plaintiff's claim of retaliation for representing workers against management and participating in union activities implicated matter of public concern), *with Luck v. Mazzone,* 52 F.3d 475 (2d Cir. 1995) (employee's letter to radio station that courtroom-library where she and three others worked was not air conditioned raised matter of private concern), *and Riedinger v. D'Amicantino,* 974 F.Supp. 322, 330 (S.D.N.Y.1997) (plaintiff's sexual harassment complaint was matter of private concern since she complained of her own treatment).

■ Plaintiff's eight-page complaint to Port Authority's EEO office nowhere alleges discrimination against anyone other than herself; nor does she complain about any Port Authority-sanctioned policy or pattern of discriminatory treatment of herself or co-workers. (*See* Pl.'s Jan. 9, 1995 complaint to the Port Authority EEO office, Ex. E to Defs.' Notice of Motion.) Her complaint, therefore, raised a matter of only private concern.

Accordingly, plaintiff's claims under the First Amendment are dismissed.

### IV. *Claims Under § 1983*

Plaintiff alleges that defendants are liable under 42 U.S.C. § 1983 for violating her

not similar to that of New York State agencies.

right to equal protection under the laws by discriminating against her because of her gender. Defendants argue that "Since plaintiff's § 1983 claim is identical to those asserted under Title VII, the § 1983 claim should be dismissed." (Defs.' Mem. of Law at 18.)

■ "The Supreme Court declared fifteen years ago that individuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment." *Annis v. County of Westchester, New York,* 36 F.3d 251, 254 (2d Cir.1994) (reversing dismissal of complaint and allowing plaintiff to bring sex discrimination claim under § 1983 without concurrently pleading a Title VII claim); *see Davis v. Passman,* 442 U.S. 228, 235, 99 S.Ct. 2264, 2271–72, 60 L.Ed.2d 846 (1979). Although Title VII also prohibits sex discrimination in employment, it is not a public employee's exclusive remedy. *Annis,* 36 F.3d 251; *Saulpaugh,* 4 F.3d at 143–44. While a plaintiff may not base a § 1983 claim on a violation of Title VII, *see Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 576 (2d Cir.1989), she may bring a § 1983 claim if the source of the federal right is found elsewhere. Since plaintiff's § 1983 claim here is based on a violation of the equal protection clause (unequal treatment because she is a woman) and not Title VII, that claim survives dismissal as a matter of law.

■ Defendants argue alternatively that they are entitled to qualified immunity.[9] As a municipal agency, the Port Authority cannot be held vicariously liable for the acts of its employees; it can only be held liable if it had a custom or policy that promoted unconstitutional conduct. *See Monell v. Dep't of Soc. Serv. of New York,* 436 U.S. 658, 691–695, 98 S.Ct. 2018, 2036–2038, 56 L.Ed.2d 611 (1978).

Plaintiff has not presented any evidence that the RIF promoted sex discrimination. Indeed, the record shows that the RIF was undertaken for legitimate business reasons. The gravamen of plaintiff's termination claim is that Rosenshein implemented the RIF in a discriminatory manner. Since the Port Authority cannot be held vicariously liable for Rosenshein's acts, and because there is no evidence that the RIF was a discriminatory policy, her claim against the Port Authority under § 1983 must be dismissed.

■ Defendant Rosenshein is entitled to qualified immunity if he can show that his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), "or even where the rights were clearly established, if it was objectively reasonable for [him] to believe that [his] acts did not violate those rights," *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (citing *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).

Rosenshein does not dispute that the right be free from sex discrimination is a clearly established right. Instead he argues that "Since the decision to terminate plaintiff was based solely upon the elimination of her position, plaintiff has failed to show that Rosenshein should have known his actions violated a clearly established, federally protected right." (Defs.' Reply Mem. at 20.) In support, he cites the undisputed fact that he selected McNamara for termination and argues that his decision to terminate Settecase was based entirely on legitimate considerations.

Plaintiff complains not only of discriminatory termination, however, but also of being treated unequally while she was employed by the Port Authority. For example, she claims that she was given clerical work instead of the substantive work she was assigned at WTI and that she was excluded from meetings at which the male GIA employees were present. Rosenshein admits that he selected Settecase because she "possessed the background and experience essential to successfully implement the numerous administrative changes inherent in the creation of a new unit" and because her "legal background could be beneficial once the unit became involved in actual projects" (Rosenshein Aff.

---

9. The Port Authority is not entitled to Eleventh Amendment immunity. *Hess v. Port Auth. Trans-* *Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994).

¶ 7), yet he never satisfactorily explains why her duties were diminished. Furthermore, while Rosenshein claims that McNamara, not he, "was fully responsible" for assigning work to Settecase and Danoff (*id.* ¶ 9), Settecase asserts that Rosenshein "referred to himself as the managing director of GIA and oversaw the operation of GIA" (Settecase Aff. ¶ 10). Thus, whether Rosenshein actually controlled the work assignments is a disputed factual question.

On the current record, it cannot be said that Rosenshein's treatment of Settecase was based solely on legitimate factors. He has set forth no reason for the disparity in the nature of plaintiff's assignments in GIA compared to the assignments she worked on in WTI and those Danoff received in GIA. Moreover, had she received more responsible assignments through which she could have continued to prove her value to Port Authority, she might not have been selected for the RIF. Thus, it cannot be said at this point that Rosenshein's actions were reasonable, since the reasons for those actions are matters of fact that cannot be determined on summary judgment.

Accordingly, Rosenshein is not shown to be entitled to qualified immunity, and plaintiff's claim of sex discrimination against him under the equal protection clause of the Fourteenth Amendment survives.

### V. *Punitive Damages*

Since plaintiff's sole surviving claim is against Rosenshein alone, the question of the Port Authority's immunity from punitive damages need not be addressed.

Punitive damages could be awarded against Rosenshein if he acted wantonly, willfully, maliciously and intentionally violated federal law. *See Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 909 (2d Cir. 1993). That question is best left until trial, when the record is more fully developed. Defendants' motion to dismiss plaintiff's claim for punitive damages against Rosenshein is denied without prejudice to renewal.

### *Conclusion*

Defendants' motion is granted in all respects except as to plaintiff's equal protection and punitive damages claims against defendant Rosenshein.

So ordered.