Yvette WALTON, Plaintiff,

v.

Howard SAFIR, Commissioner of the New York City Policy Department and The City of New York, Defendants.

No. 99CIV.4430(AKH).

United States District Court, S.D. New York.

Nov. 27, 2000.

As Corrected Jan. 3, 2001.

Christopher Dunn and Norman Siegel, New York Civil Liberties Union Foundation, New York City, for Plaintiff.

Norma A. Cote, Andrea Moss and James Lemonedes, New York City Law Department, New York City, for Defendants.

## DECISION AFTER TRIAL (FINDINGS OF FACT AND CONCLUSIONS OF LAW)

HELLERSTEIN, District Judge.

On April 19, 1999, Plaintiff Yvette Walton was dismissed as a police officer after twelve years of service. She complains that she was terminated by defendant Howard Safir, the former Commissioner of the New York City Police Department, in retaliation for publicly criticizing the Department regarding what she claimed were the racially discriminatory policies of its Street Crime Unit. In particular, Walton claimed in her criticism that those policies led to the killing of Amadou Diallo. Plaintiff sues Safir and the City, pursuant to 42 U.S.C. § 1983, for violating her rights under the First Amendment of the United States Constitution.

Defendants deny that plaintiff's termination was related to her public statements. They counter that since she was on probationary status following an administrative trial and finding of insubordination, and since she again violated departmental orders regulating sick leave, the termination of her employment was according to procedure and justified.

The case was tried to the Court without a jury on July 11, July 12, July 13, and July 19, 2000. On the basis of the trial record, supplementary information thereafter submitted pursuant to my requests to the parties, and post-trial briefing, I find for the plaintiff. My opinion, constituting my findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure,[1] follows.

### Facts

In April 1993, soon after the New York City Police Department launched its Street Crime Unit initiative ("SCU"), Yvette Walton, a six-year veteran, was recruited to join. The SCU was to be an elite, centrally-based, aggressively interventionist police unit, cruising the streets of the most crime-ridden areas of the City, searching for and apprehending drug-dealers, illegal gun possessors and perpetrators of violent crimes. Walton, one of only three African–American women who joined the Unit, was the only African–American woman assigned to street patrols. Reports indicate that she was an effective police officer, gaining eighteen commendations for her police work. In March 1995, however, pursuant to her request, she transferred out of the unit. She sought the transfer based on her belief that the Unit engaged in racially discriminatory practices that disproportionately targeted minorities in illegal search and seizure operations.

Four years later, on February 4, 1999, Amadou Diallo, a black, West African immigrant, was shot and killed by several SCU officers during a search for a rape suspect. The shooting prompted Walton, at the invitation of a group called "100 Blacks in Law Enforcement Who Care,"[2]

---

1. The findings of fact and conclusions of law set forth in this opinion dispose also of Defendants' motion for judgment on partial findings pursuant to Rule 52(c), Fed.R.Civ.P.

2. The organization, as described in the testimony of its leaders and founders, Eric Adams and Noel Leader, is private and loosely organized, and is intended to protest racial discrimination of African Americans and other minorities. (Tr., p. 140–43). The organiza-

("100 Blacks"), publicly to criticize the SCU for its tactics and for the allegedly anti-minority attitudes of its officers. Walton, basing her comments on her experiences as a former member of the Unit, expressed her criticism at a February 14, 1999 press conference aired on several New York City television stations. She appeared in disguise, wearing a black leather jacket, a heavy gray hood, dark glasses, and a white and black scarf drawn tightly across her face. Her voice was electronically altered on all the broadcasts. However, her sex could be detected in a picture that revealed her stockings and shoes. Additionally, hints could be found in one reporter's introduction of Walton as a former Street Crime Unit officer who would be discussing "the Unit's discrimination and the violation of civil rights." This reporter stated: "that's why *she* left." (emphasis added).

Approximately two weeks later, on February 19, 1999, Walton, again in disguise and with altered voice, appeared on a special presentation of Nightline, a nationally popular ABC nightly news program, and she again criticized SCU's treatment of minorities.

On April 19, 1999, two months later, Walton testified before the New York City Council. Again in disguise, she whispered her comments to Adams and Leader, who relayed them to City Council members. Her testimony followed the testimony of Commissioner Safir. After testifying, Walton contacted her command, intending to request to be excused for the remainder of the day. Instead, the sergeant on duty informed her that she was dismissed from the Police Department, effective as of 4:00 p.m.

Plaintiff claims that, notwithstanding her appearances in disguise, her identity was known and of interest to Commissioner Safir and his executive staff. She further maintains that her dismissal by

Commissioner Safir was in retaliation for exercising her constitutional right to free speech. Defendants deny any intention to retaliate, and further deny that they were even aware of or concerned with the fact that plaintiff was the disguised individual who expressed criticisms of the SCU. In defense of their actions, defendants claim that plaintiff was dismissed because of violations of Police Department regulations concerning sick leave during a term of probationary status. Defendants maintain that plaintiff, as a result of these violations, was properly terminated. I will discuss the applicable standards and the policies and practices relating to the respective contentions of the parties later in this opinion. At this point, a fuller development of plaintiff's career as a police officer will aid in understanding the claims and defenses.

Plaintiff Yvette Walton joined the New York City Police Department on July 28, 1987, following her graduation from the Police Academy. In April 1993, based on her record of six-years of service as a police officer, she was recruited to join the SCU. During two years of street patrols with that elite unit, from April 1993 to March 1995, she earned 18 commendations for excellent police duty.

Plaintiff subsequently requested a transfer from the SCU. Her transfer resulted in reassignment to the 28th Precinct in the Bronx. She testified that she had requested transfer because she had become uncomfortable with what she perceived were improper SCU tactics that impacted adversely on minority—in particular African American—communities. From Walton's personnel record, it appears that the quality of her performance then diminished and the number of her absences and sick leaves increased.

On August 11, 1997, an incident occurred involving plaintiff and her com-

---

tion is not officially recognized by the New York City Police Department. *See Latino Officers Assoc., New York, Inc. v. City of New*

*York,* 196 F.3d 458 (2d Cir.1999) (explaining recognition procedure and significance).

manding officer, Deputy Inspector Joyce Stephen, which led to charges and specifications being presented against her. It appears from the record that plaintiff had been assigned to desk duty and was receiving a complaint over the telephone from an aggrieved person in the community, when Stephen ordered plaintiff to report to her immediately. Plaintiff asked Stephen to wait until the complainant completed her statement. Stephen, however, insisted on immediate compliance, to which plaintiff reacted with intemperate remarks and expletives. Deputy Inspector Stephen preferred charges and specifications and, after an administrative trial, plaintiff was found guilty. This finding of guilt resulted in plaintiff being placed on dismissal probation on July 3, 1998.[3]

In October 1998, plaintiff was transferred to Bronx Central Booking, a unit responsible for the custody and movement of detainees incident to their arraignments and bail applications. Once again, under a new commander, she received consistently positive evaluations of her work. She was also twice injured in the line of duty while coming to the aid of fellow officers. In the first incident, on September 28, 1998, a burly prisoner, resisting being restrained in his cell, hit her with a head-butt, causing plaintiff to suffer a concussion that kept her out of work and on sick-leave absence for approximately a week. In the second incident, a kick by a prisoner to Walton's right thumb injured the tendons in her hand, requiring an operation that surgically severed and repaired her injured tendons. This incident resulted in sick-leave absence in October and November of the same year.

Police regulations provide that an officer on sick leave comes under the jurisdiction of the NYPD Medical Unit. Further, the injured officer remains confined to her residence except for authorized absences, such as visits to doctors. The record reflects that on October 7, 1998, plaintiff was granted permission to leave her residence at 1200 hours to visit her doctor, with instructions to return by 1600 hours, but that she did not return to her home until 2100 hours.

Plaintiff allegedly also failed to respond timely to "green cards" left at her residence on October 14, 20 and 21, 1998. Green cards reflect official requests by a Medical Division officer who, on those dates during her sick leave, visited her home to check on her presence. Not finding her at home, the officer left the green cards as an order for her to call the Medical Division desk sergeant when she returned. Walton was alleged to have responded late by 37, 25 and 35 minutes, respectively. Further, she is alleged to have failed to sign an attendance log at a Bronx health care facility on October 21st when she visited for after-care surgical treatment of the repaired tendons in her right hand.

These infractions gave rise to two sets of disciplinary proceedings. Plaintiff's lateness in responding to the green cards that were left at her home and her neglect to sign out of the district surgeon's office—the October 14, 20 and 21 infractions—became the subject of one set of charges which were investigated by Sergeant Nanette Fernau of the Medical Division. Plaintiff's delay in returning to her home on October 7th after her visit to her doctor became the subject of a second charge investigated by Sergeant Dennis Beazer of the Medical Division. On November 19, 1998, Sergeants Fernau and Beazer presented their charges to Walton and her assigned Police Benevolent Association union representative. Thereafter, according to practice, if the investigating officers believe that a sanction may be appropriate, they are to decide whether to remit the charge to the officer's commander to consider administering a "command discipline," a minor punishment that can affect accumulated leave time or, alternatively, to

---

**3.** "Dismissal probation" is not mentioned in the applicable regulations. The regulations provide for "disciplinary probation." The distinction will be discussed *infra*.

the Department Advocate's Office to consider drafting formal charges and specifications for an administrative trial which could result in more serious punishments, including suspension and dismissal from the Police Department.

On November 24, 1998, five days later, Fernau and Beazer met with Lieutenant Anthony Barlanti, a lawyer in the Department Advocate's Office, to discuss an appropriate course of action. Fernau, following Lieutenant Barlanti's recommendation, referred her file to Captain Littlejohn, Walton's commanding officer, for consideration of a command discipline.[4] Beazer's file, however, remained with Beazer.

On January 12, 1999, Captain Littlejohn met with Walton to administer the intended command discipline. However, Walton's union representative was not present to represent her, and Littlejohn was therefore unable to proceed. He informed Walton that he was thinking of ordering a day's loss of vacation time as the extent of punishment, and postponed their meeting until February 23, 1999, when Walton was scheduled to return from vacation.

On February 14, 1999, Walton appeared at the "100 Blacks" press conference in disguise. On February 17, 1999, three days later, Barlanti, apparently learning that Sergeant Beazer had not remitted her file to Captain Littlejohn along with Sergeant Fernau's investigative file, called the Medical Division to request Walton's "investigative package." Barlanti asked for a "49," Police Department jargon for a memorandum to recommend charges and specifications against Walton. *See* Tr. at p. 542, Ex. E. Barlanti reported his action to Deputy Inspector Patrick Bradley, presumably in response to Bradley's instruction, and was ordered to "monitor" the case and to keep him "apprised." Tr. at p. 543, Ex. E. Asked to explain, Barlanti testified that Inspector Bradley was interested "in all the cases," to "keep them moving." Tr. at p. 543.

Barlanti received Beazer's file the very next day, February 18, and brought it to his superior, Captain Heatherington, the executive officer of the Department Advocate's office. The file shows Captain Heatherington's note: "leave consult open, obtain necessary info ASAP, confer, refer to EMD." EMD, or the Employee Management Division, is the section of the Police Department that processes dismissals of police officers.

On February 23, upon Walton's return from vacation, she met with Littlejohn as scheduled to receive her command discipline. Again, the union representative was absent and the matter was postponed. The next day, with the delegate present, Littlejohn expressed uncertainty as to his ability to proceed. After a telephone call, he told Walton that he had to wait for instructions, and recessed their meeting. On the following day, February 25, 1999, Captain Littlejohn informed plaintiff that the command discipline was to be changed to charges and specifications.

Littlejohn's telephone call appears to have been with Barlanti. Barlanti, following Bradley's instructions, had removed Fernau's command discipline from Littlejohn in order to "roll" it into the charges and specifications he intended to prepare on Beazer's investigation. On March 7 or 8, Barlanti received Fernau's investigative report and, on March 18, forwarded the charges and specifications he drafted with respect to both the Fernau and Beazer investigations to Assistant Commissioner Kevin Lubin, Chief of the Department Advocate's Office, and requested "official guidance." Lubin forwarded the materials to EMD. Endorsements recommending dismissal were added by Chief of Personnel Michael Markman and First Deputy Police Commissioner Patrick Kelleher. On April 12, 1999, Commissioner Safir endorsed his approval. On that same day, the New York City Council was scheduled

---

4. The specific discipline suggested was a Schedule A command discipline, the lowest form of punishment that can be imposed by a command discipline.

to conduct hearings concerning the tactics used by the SCU, but the session was postponed one week. On April 19, 1999, the day Walton testified, immediately following her testimony, Walton was informed that she had been dismissed as a police officer, effective that afternoon.

### Dismissal Probation

The Police Department dismissed Walton without a hearing or a trial. Police Commissioner Safir testified that Walton could be dismissed without a hearing or a trial because she was in a status of dismissal probation when she committed her infraction. He testified that her record of good performance ratings in Bronx Central Booking was irrelevant, and it was also irrelevant that her sick leave involved, not malingering, but post-operative care following her surgery to repair a line-of-duty injury. As Commissioner Safir testified, Walton's status of dismissal probation gave him cause to dismiss her based on only the charge of an additional infraction, without having to consider any other aspect of her record. As to why action was taken months after the infraction had occurred, Commissioner Safir testified that the delay was normal.

The New York City Administrative Code and the Police Department's implementing regulations do not mention a status of "dismissal probation." Defendants testified that the practice is nevertheless standard in the New York City Police Department. However, no policy directive or other writing reflects such a status; none was produced and none could be found.

Section 14–115(d) of the Administrative Code of the City of New York, cited by defense counsel, authorizes the Police Commissioner to suspend a judgment of discipline against a member of the police force, to place the member on probation for up to a year, and to impose punishment at any time during that probationary period.[5] Dismissal of a probationary officer, however, is a "remedy of last resort," even during a period of probation. N.Y.C. Admin. Code § 434a–14.0; N.Y.P.D. Admin. Guide § 318–9. Before an officer is to be dismissed, the officer's performance during probation is to be reviewed, and "guidance" is to be given to that officer. *Id.* Section 434a–14.0 provides:

> Although a penalty of dismissal may be imposed for violation of the terms of probation, it is a remedy of last resort. Before such penalty is assessed, the member's probationary performance will be reviewed to determine his attitude and willingness to comply with the terms of probation and whether guidance received was structured to deal with his particular problem.

Thus, dismissal is not to follow automatically from an infraction committed during probation. The lesser punishment of a command discipline remains an appropriate sanction and is "not discouraged." *Id.*

---

5. Section 14–115(d) provides for suspension of punishment and probation:

> Upon having found a member of the force guilty of the charges preferred against him or her, either upon such member's plea of guilty or after trial, the commissioner or the deputy examining, hearing and investigating the charges, in his or her discretion, may suspend judgment and place the member of the force so found guilty upon probation, for a period not exceeding one year; and the commissioner may impose punishment at any time during such period.

> Section 14–115(a) provides the grounds upon which a police officer may be disciplined, and the range of punishments with respect to such discipline.

> The commissioner shall have power, in his or her discretion, on conviction ... of a member of the force of any criminal offense, or neglect of duty, violation of rules, or neglect or disobedience of orders, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct or conduct unbecoming an officer, or any breach of discipline, to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension without pay during such suspension, or by dismissal from the force; but no more than thirty days' salary shall be forfeited or deducted for any offense....

Imposition of Command Discipline during probationary periods is not discouraged and will not necessarily be viewed as a violation of the terms of probation.

A member of the police force has the right not to be dismissed except after written charges have been "examined, heard and investigated" by the commissioner or deputy commissioner, upon "reasonable notice to the member," pursuant to "rules and regulations, from time to time prescribe[d]" by the commissioner.[6]   N.Y.C. Admin.  Code § 14–115(b).

Commissioner Safir testified that these protections apply to "disciplinary probation," not "dismissal probation;" the difference, he said, was like "apples and oranges." [7]  In contrast, Lieutenant Barlanti testified that the terms "disciplinary probation" and "dismissal probation" are used interchangeably by the Department Advocate's Office.[8]  Thus, Patrol Guide 118–05 (Ex. GG) provides:

> [if] charges are preferred against a member who has been placed on disciplinary/dismissal probation, the specifications will be prefaced with the words, "While on disciplinary/dismissal probation."

Barlanti testified that he was familiar with regulations concerning disciplinary probation, but did not know of any regulation concerning dismissal probation.  Commissioner Safir, explaining the absence of any distinguishing regulation or policy directive, testified that the regulations providing for disciplinary probation reflected the policy of earlier commissioners, not his, and that he disapproved of the regulations.  Commissioner Safir testified:

Dismissal probation is where you are *de facto* dismissed from the Department but you are given another chance to show that you intend to comply with the rules and regulations of the Department. I had no part in putting disciplinary probation into the administrative guide. Had I been commissioner at the time, I never would have approved it.[9]

The procedures followed by defendants in dismissing Walton were not consistent with the City's Administrative regulations and the Police Department's written directives.

### I.   First Amendment Criteria: Standards and Burden of Proof

■ Government employees, like all others, have a First Amendment right to speak and may engage in public criticism of the agencies for which they work. *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), *citing Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).  Indeed, public employees "are often in the best position to know what ails the agencies for which they work [and] public debate may gain much from their informed opinion ...." *Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *see also Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Defendants agree that the disguised speaker at the February 14th press conference is entitled to constitutional protection.  Defendants claim that they were unaware of the identity of the speaker and that plaintiff's employment was terminated not because she was believed to be the

---

**6.**  Section 14–115(b):

Members of the force, except as elsewhere provided herein, shall be fined, reprimanded, removed, suspended or dismissed from the force only on written charges made or preferred against them, after such charges have been examined, heard and investigated by the commissioner or one of his or her deputies upon such reasonable notice to the member or members charged, and in such manner or procedure, practice, examination and investigation as such commissioner may, by rules and regulations, from time to time prescribe.

**7.**  Transcript of trial ("tr.") at pp. 388, 413–14.

**8.**  Tr. at p. 494.

**9.**  Tr. at p. 388.

speaker, but because of independent reasons—her disciplinary infractions while on dismissal probation.

An issue of fact is thus presented. I must, therefore, evaluate the proofs in relation to the parties' respective burdens of proof.

In *Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Fred Doyle, an untenured teacher, charged that the Mount Healthy School District refused to renew his contract because he had expressed his criticism of a recently instituted dress code on a local radio station. The School District claimed that Doyle's contract was not renewed because of his history of unsatisfactory and untactful conduct, and that the incident with the radio station reflected his indifference to good school relationships. The district court found for the plaintiff, holding that the School District's decision not to renew, since it was based at least in part on his speech, infringed on his First Amendment rights. The court of appeals affirmed, but the Supreme Court reversed. The Supreme Court held that there were two burdens of proof to evaluate: the plaintiff's burden to show that his constitutionally protected conduct "was a 'motivating factor' in the Board's decision not to rehire him;" and the School District's burden to show "by a preponderance of the evidence that it would have reached the same decision as to [plaintiff's] reemployment even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. 568.

■ The Supreme Court elaborated: an employee gains no better standing merely because he engages in constitutionally protected conduct. If an employer shows, and it is the employer's burden to show, that it would not have hired the employee anyway, the employer's decision will be upheld:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be

able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* Since the record did not make clear if the lower court had properly evaluated the proofs in relation to the differing burden of proof, the Supreme Court remanded the case.

■ Thus, Walton, the plaintiff in the case before me, has the initial burden to show that "a causal connection exists between [her] speech and the adverse determination against [her], so that it can be said that [her] speech was a motivating factor in the determination [by Commissioner Safir to terminate her employment]." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999). Although her probationary status does not diminish her right, *see Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), neither does it elevate her right, for a defendant is allowed then to demonstrate by a preponderance of the evidence that "it would have reached the same decision even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. 568.

The burden of proof analysis of *Mount Healthy* was applied in a recent Second Circuit decision, *Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26 (2d Cir.1996). The issue in that case was whether counterclaims filed by a public authority against a taxpayers' group, seeking damages against the taxpayers' group for the consequences flowing from their earlier lawsuit, violated the taxpayers' constitutional rights of free speech and petition. The jury found that the public authority had caused a chilling of First Amendment rights, and the district court upheld the verdict. The Court of Appeals reversed, holding that the jury had not

been instructed to evaluate the evidence according to the shifting burden, from plaintiff to defendant. First, the plaintiff must show a retaliatory intention to deter the exercise of First Amendment rights.

> [The citizens groups] are ... required to persuade the jury that the counterclaims were filed, not as a legitimate response to litigation, but as a form of retaliation, with the purpose of deterring the exercise of First Amendment freedoms.

*Id.* at 31. If the citizens groups are successful, the Court of Appeals continued, the public authorities can still avoid liability if they persuade the jury that they would have filed the counterclaims in any event.

> if the [citizens groups] are successful in persuading a jury that [the public authorities] were prompted to file their counterclaims with retaliatory intent, [the public authorities] would still be entitled to avoid liability if they could persuade the jury that they would have filed the counterclaims even in the absence of the impermissible reason.

*Id.* (citations omitted).

■ Retaliatory motive is rarely proven by direct evidence. *Housing Works, Inc. v. City of New York,* 72 F.Supp.2d 402, 422 (S.D.N.Y.1999), *appeal dismissed,* 203 F.3d 176 (2d Cir.2000). A temporal relationship between protected activity and an adverse employment condition can be significant.

> Circumstantial evidence of retaliation may be found when defendants are aware that plaintiff has engaged in protected speech and defendants' challenged behavior closely follows that protected speech.

*Id.* at 422—23; *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 280 n. 2 (2d Cir.1999) (dictum). But whether circumstantial or direct, "[t]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is

to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). Plaintiff has the burden to prove such retaliation by "tangible proof." *Id.* at 111. Once plaintiff does so, the burden shifts to the employer to show its legitimate reason then and there to dismiss the employee. *Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 275 (2d Cir.1996). The employer must show that it had a legitimate reason to discharge the employee on the day of the employee's actual dismissal; if "circumstances would not have motivated a discharge on that day, but only at some later time," an impermissible firing because of the plaintiff's having engaged in protected activity may be found. *Id.* As the Supreme Court has stated:

> An employer may not, in other words, prevail ... by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision.

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 252, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion).

The issue in the case before me is whether the City of New York, through former Commissioner Safir, terminated Walton's employment because she exercised her right under the First Amendment to criticize the Police Department's Street Crime Unit for racially discriminatory policies. Plaintiff has the initial burden to show that Commissioner Safir's executive staff knew that it was plaintiff who appeared as spokesperson for the 100 Blacks organization at the February 14, 1999 press conference and, after that, on television and before the City Council, and that Commissioner Safir's dismissal of the plaintiff was retaliatory. It is the City's burden to prove that the reason it assigned for terminating Walton, because of her slowness in returning to her home after the visits to her doctor and in not promptly reporting her whereabouts during that interval to the Police Department's medi-

cal unit, was, in fact, the reason that it terminated Walton on April 19, 1999, directly following her testimony to the City Council. In other words, as the Court of Appeals in *Greenwich Citizens* put it, was the defendant's response "prompted by a legitimate reason, not an impermissible reason." *Id.* at 33.

## II. *Personal and Official Liability*

■ Plaintiff brought and tried this suit against the City of New York and Howard Safir in his official capacity as Commissioner of the New York City Police Department. Compl. ¶¶ 9, 10. Plaintiff claims that defendant Safir, under "color" of the statutes, ordinances, regulations, customs or usages applicable to him as Police Commissioner, deprived the plaintiff of her rights, privileges, or immunities secured by the Constitution and laws of the United States, 42 U.S.C. § 1983, and that the city is therefore liable for Safir's wrongs.[10]

### A. *Plaintiff's Motion to Amend to Sue Defendant Safir Personally*

Since the trial, Commissioner Safir resigned his office as Police Commissioner, and plaintiff moved to amend her complaint to allege claims against him personally. She contended that she was asking merely that the pleadings be conformed to the proofs. *See* Fed. R. Civ. Proc. 15(b). Her contention is without merit and her motion is denied.

■ Plaintiff pursued her claim against defendant Safir "in his official capacity."

Compl. ¶ 9. The proofs at trial did not focus on whether Safir had any personal motivation in connection with the employment, investigative and bureaucratic actions taken against plaintiff. *See Geller v. Staten Island Developmental Center,* 1991 WL 99054, at \*8 (N.D.N.Y.1991). Nor did Safir have incentive to develop defenses available to him personally, such as asserting immunity for having objectively and reasonably relied on existing law. *See Goldberg v. Town of Rocky Hill,* 973 F.2d 70, 73 (2d Cir.1992). Nor did defendants have the incentive to retain personal counsel interested in developing personal defenses. *See Tiffany v. Village of Briarcliff Manor,* 216 F.3d 1073 (Table), Unpublished Disposition, 2000 WL 900206 (2nd Cir.2000).[11] *See generally Kentucky v. Graham,* 473 U.S. 159, 168 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Plaintiff's motion to amend would subject defendants to substantial prejudice and, on the law and in the exercise of my discretion, I deny the motion. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

### B. *Defendants' Suggestion of Resignation and Succession*

■ Defendants have filed a Suggestion, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, of Commissioner Bernard Kerik's succession as Commissioner of the New York City Police Department. However, it is not necessary to substitute Commissioner Kerik as a defendant. Plaintiff's action does not abate, and

---

**10.** Section 1983 provides in pertinent part:

Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Sykes v. James,*

13 F.3d 515, 519 (2d Cir.1993). Section 1983 does not confer substantive rights, but rather provides a means by which aggrieved persons may allege violations of their federal or constitutional rights. *See, e.g., Yuan v. Rivera,* 48 F.Supp.2d 335, 343 (S.D.N.Y.1999).

**11.** In this case, counsel, acting for both the municipality and the individual, came into conflict when the jury's verdict discharged the individual but found the municipality liable for Constitutional violations. The Court of Appeals cautioned against such dual representations when conflict might arise.

the City of New York, which remains a defendant, can respond to any finding of official liability. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Geller,* 1991 WL 99054, at *8. Section 1983 actions brought against government officials in their official capacities "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 at 167 n. 13, 105 S.Ct. 3099. Since local governments can be sued directly in section 1983 cases, there is no need to bring official-capacity suits against local government officials. *Geller,* 1991 WL 99054, at *8. Accordingly, defendant's motion to substitute the current Police Commissioner pursuant to Rule 25(d) is denied.[12]

### C. *Municipal Liability*

▆▆▆▆ Municipalities may be held liable for depriving individuals of their constitutional "rights, privileges, or immunities," if the deprivation proximately results from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers" explicitly or by the municipality's custom and practice. *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Although municipal liability cannot attach merely because of *respondeat superior,* the act of an official with final decision-making authority, if it wrongfully causes the plaintiff's constitutional injury, may be treated as the official act of the municipality, resulting in Section 1983 liability of the municipality. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *White–Ruiz v. City of New York,* 983 F.Supp. 365, 380

(S.D.N.Y.1997) (holding City liable for unwritten Police Department policy to retaliate against officers who exposed police corruption).

State law determines whether and in what circumstances an official possesses final policy-making authority. *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292. Commissioner Safir testified that only he, as Police Commissioner, had the authority to dismiss a New York City Police Officer. His authority stems from section 434 of the New York City Charter, which provides that the Police Commissioner is to have

cognizance and control of the government, administration, disposition and discipline of the department, and of the police force of the department [... and that the] Commissioner shall be the chief executive ... chargeable with and responsible for the execution of all laws and the rules and regulations of the department.

*See Domenech v. City of New York,* 919 F.Supp. 702, 710 n. 1 (S.D.N.Y.1996). Although the New York City Charter also vests "general authority to make final City policy" in the Mayor and City Council, see N.Y.C. Charter at §§ 3, 8(a), 21 and 28, and decision-making authority for personnel management in the Commissioner of the Department of Citywide Administrative Services ("DCAS"), see *id.* at §§ 811, 814(c), these general provisions do not diminish the specific and authoritative responsibility of the Police Commissioner as "chief executive" of the Police Department, with "cognizance and control of the government, administration, disposition and discipline of the department," to terminate the employment of a police officer. *Id.* at §§ 1129, 434. And it is the actuality of the Police Commissioner's power and authority, not theoretical questions, that deter-

---

12. *See Nogue v. City of New York,* 1999 WL 669231, at *6 n. 13 (E.D.N.Y. Aug.27, 1999) (dismissing official-capacity suit against Police Commissioner as duplicative of case against the City). Plaintiff concedes that since "an official-capacity compensatory-

damage claim" is treated as a claim against the City, and since the City has been a party all along, suing the Police Commissioner adds nothing. *See* Pl. Letter of August 28, 2000 at p. 2.

mine whether an official's action is an official, municipal act, or merely the private, individual act of that official. *See McMillian v. Monroe County,* 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Praprotnik,* 485 U.S. at 126, 108 S.Ct. 915; *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983); *Domenech v. City of New York,* 919 F.Supp. 702, 710 n. 1 (S.D.N.Y.1996); *Eng v. New York City Police Dep't et al.,* 1996 WL 521421, at *7 (S.D.N.Y. Sept.12, 1996) (municipal liability based on decisions by police commissioner to terminate or transfer officers).[13]

In the case before me, the decision to terminate plaintiff Walton's employment as a New York City police officer was made at the highest level of the Department, by Police Commissioner Safir and Deputy Commissioners working directly under him. The action constitutes official action, whether regarded as a termination for disciplinary purposes during probation as defendant claims, or as a termination reflecting retaliatory action for plaintiff's public criticisms as plaintiff claims. There is no allegation or proof that the dismissal of Walton was personally motivated.

### III. *Plaintiff's Disguised Identity and the New York Police Department's Knowledge and Interest*

Plaintiff participated in disguise at the February 14, 2000 press conference called by "100 Blacks in Law Enforcement," but I find that her disguise did not succeed in shielding her identity from those who had an interest to know who she was. Clearly the individual speaking was a woman, as indicated by her voice and her stockings. The alteration of her voice on the television clips did not disguise her gender, for an announcer referred to her as a woman, and viewers could see her stockings. The individual was introduced as a former member of the Street Crime Unit, and since she was one of only three African–American women who had been assigned to the Street Crime Unit during her period of service and the only African–American woman actually on patrol duty, it could not have been difficult for the Department to ascertain the identity of the police officer who was using her own experience to charge the SCU with discriminatory behavior. And, clearly, the Department's Intelligence Division knew about the 100 Black's February 14th conference, for it was advised as to its time and place and the topic to be addressed.

The 100 Blacks organization itself, and Eric Adams its co-founder and leader, were being investigated at the time by the Police Department's Internal Affairs Bureau ("IAB"). The investigation included covert surveillance of Adams, monitoring of his incoming and outgoing telephone calls, and monitoring of 100 Blacks' public events. The investigation was not limited by any specific administrative or judicial warrant or other authorization, and there was no requirement to account for that which was learned or intercepted.[14]

---

**13.** *Cf. Collins v. Stasiuk,* 56 F.Supp.2d 344, 345 (S.D.N.Y.1999) (retaliatory termination by Commissioner and Deputy Commissioner of Department of Environmental Protection, held, case dismissed against municipality and upheld against commissioner personally, since terminations reflected personal concerns, and did not reflect "a definite course or method of action that was designed to guide future decision making, or in furtherance of some governmental body's high-level overall plan.")

**14.** A warrant based on probable cause must be obtained by law enforcement agencies in order to intercept telephone conversations,

*see* Title III, Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(3). When law enforcement agencies propose to record telephone numbers of callers made to or from a particular telephone, agencies are required to certify, in order to obtain a court order authorizing such, that "the information likely to be obtained is relevant to an ongoing criminal investigation," *see* Electronic Communications Privacy Act of 1986, 18 U.S.C. § 3122(b)(2). *See generally United States Telecom Assoc. v. FCC,* 227 F.3d 450 (D.C.Cir. 2000). The City Charter grants the Commissioner authority to issue subpoenas in administrative investigations, but is silent about au-

I find that the Police Department knew that it was Walton who was the spokesperson of 100 Blacks criticizing the SCU for employing discriminatory policies that led to the killing of Amadou Diallo. The Police Department knew of Walton's role from their monitoring of 100 Blacks' activities, from their monitoring of incoming and outgoing calls to and from the 100 Blacks' telephone, and from the ease with which Walton was identifiable behind her disguise.[15] The Department also knew that a female member formerly with the SCU, presumably the same female spokesperson, was to testify at the City Council hearing concerning the SCU scheduled for April 12, 2000, and that she was the person who testified at the adjourned City Council meeting held April 19, 1999. On April 12, 1999, Commissioner Safir endorsed Walton's file approving that she should be dismissed and, on April 19, 2000, Commissioner Safir's order dismissing Walton from the New York City Police Department became effective.

Thus, I find that the Police Department knew that it was plaintiff who criticized police behavior as the spokesperson for 100 Blacks in Law Enforcement at its February 14, 1999 press conference, and that the Police Department's denial of this knowledge is not credible. The remaining question is whether defendant terminated plaintiff because she returned late from the doctor to her home during her sick leave while on dismissal probation, or whether defendant terminated her in retaliation for having publicly charged the Police Department's Street Crime Unit with racially discriminatory conduct leading to the killing of Amadou Diallo.

### A. Plaintiff's Termination: Retaliation or Permissible Discipline

Yvette Walton was an effective police officer. She had been recruited to join an elite group of officers who formed the Street Crime Unit in its early years—one of only three African–American women in the Unit, and the only one performing actual street patrols. Her work earned her 18 commendations in two years. After experiencing difficulty with her commanding officer following her transfer from the SCU, she again performed in superior fashion as an officer in Bronx Central Booking, earning consistently high ratings. Her readiness to perform her duties in aid of other officers at the risk of personal safety caused successive injuries to her head and to the tendons in her hand, requiring sick leave and surgery.

The New York Police Department has had a strong policy to recruit African–American officers.[16] Yet, notwithstanding its policy, it dismissed Walton, an experienced and able 12–year veteran summarily, without a hearing, and inconsistently with applicable regulations and its own practices.

Defendants insist that this dismissal was not related to Walton's public

thorizations for electronic surveillance, *see* N.Y.C. Admin. Code § 14–137.

15. The Police Department's interest in Walton was also confirmed by phone messages on the 100 Blacks' answering machine on March 9, April 9 and April 14, and from a letter Adams retrieved from his precinct mailbox on April 20, 1999. The calls and the letter to Adams, by unidentified persons within the Department's Internal Affairs Bureau, warning Adams that "the dark side," that is, the Internal Affairs Bureau, knew Walton's identity and involvement, were admitted as confirmatory evidence of Police Department interest, but not for their content or their truth or falsity. *See United States v. Oguns*, 921 F.2d

442, 448 (2d Cir.1990) (telephone call at defendant's apartment during course of law enforcement search during which inculpating code words were expressed admitted as "nonhearsay circumstantial evidence of [defendant's] knowledge and intent."); *Headley v. Tilghman*, 53 F.3d 472, 477 (2d Cir.), *cert. denied*, 516 U.S. 877, 116 S.Ct. 207, 133 L.Ed.2d 140 (1995) (approving *Oguns*, statements of unidentified caller constituted nonhearsay circumstantial evidence against defendant).

16. *After the 41 Shots*, N.Y. Times, March 9, 1999, at A22 (Mayor and Commissioner launch $10 million recruitment drive to attract blacks and Hispanics to NYPD).

criticism of the Street Crime Unit for having engaged in racially discriminatory conduct that led to the death of Amadou Diallo, and that her appearances for 100 Blacks in Law Enforcement were of no interest to the Department. I find, however, upon the facts and weighing the credibility of the witnesses, that Walton's infractions in overstaying doctor visits before returning to her home were regarded by the Department as minor infractions of the type that would normally have led to command disciplines, not dismissal, even of an officer in probationary status. Defendants failed in their burden to show that Walton normally would have been dismissed for her tardiness in returning home promptly after her doctor visits, and that the regulatory provision favoring command disciplines even in probationary status would not have applied to her. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Greenwich Citizens' Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency,* 77 F.3d 26, 33 (2d Cir.1996). I hold, therefore, that Walton's probationary status was pretext for her dismissal and that she would not have been dismissed had she not spoken out publicly on behalf of "100 Blacks in Law Enforcement" on an issue of immediate and substantial concern to the Department.

Walton's absence from home in connection with visits to her doctors for post-surgical treatment were considered minor infractions by Sergeant Fernau, the investigating officer on most of the charges, and Captain Littlejohn, Walton's commanding officer. Sergeant Fernau recommended a Schedule A Command Discipline, the most lenient of the intra-command disciplinary punishments, and Captain Littlejohn told Walton that a day's loss of vacation time would probably be the punishment he would order. If the union representative provided for police officers at such meetings had been present when Captain Littlejohn met with Walton in January 1999, the infractions investigated by Fernau would have been resolved and, with them, Beazer's related charge as well. I find, based on the credible evidence, that nothing further would have been done to punish Walton.

All this changed following the "100 Blacks" press conference of February 14, 1999. I find that Lieutenant Barlanti, whom both Fernau and Beazer had consulted in November, had been content to allow Fernau's command discipline to proceed knowing that it would have resolved the entire controversy. Suddenly, however, Barlanti began to move, prodded by the order of a Deputy Inspector of the Department on February 17th to monitor his cases, and by his commanding officer's instruction on February 18th to obtain relevant information about Walton "ASAP," and to refer the matter to the Employee Management Division, the division charged with recommending dismissals of police officers to the Commissioner. Barlanti, in order to implement his commander's instructions, began to prepare charges and specifications on Sergeant Beazer's file and, instead of allowing that file to be "rolled up" into the command discipline that Captain Littlejohn intended to administer, flipped the "roll up" and ordered Littlejohn to cede jurisdiction to him. Barlanti thus caused the lesser charge to swallow the greater charge—in effect, the shoehorn swallowed the shoe.

Dismissal for violation of the terms of probation is a "remedy of last resort." *See* N.Y.C. Admin. Code, § 434a–14.0; N.Y.P.D. Admin. Guide, § 318–9. Command Disciplines are appropriate impositions even during probationary periods; such impositions are "not discouraged ... and will not necessarily be viewed as a violation of the terms of probation." *Id.* Until he was directed otherwise immediately following Walton's February 14th press conference for "100 Blacks in Law Enforcement," Barlanti's actions convincingly demonstrate that a command discipline was the appropriate procedure for

Walton's infractions. Indeed, Barlanti testified that he doubted that he could prove the essential elements of the case against her to cause her dismissal.

Barlanti's hesitation disappeared when he was instructed to move his case following the February 14th press conference. Commissioner Safir testified that the regulations governing disciplinary probations did not apply to Walton because she was on "dismissal probation," and thus she could be dismissed at any time, summarily, for any infraction during her year of probation. Without checking on Walton's performance as a police officer, or considering the context of her infractions—that she was on sick leave not because of any issue of malingering but because of surgery to repair an injury incurred in the line of duty—and without a trial or a hearing on the charges and specifications that Barlanti was ordered to draft, Safir and his Deputy Commissioners ordered Walton dismissed from the Department.

I do not function as an Article 78 court, reviewing actions of a state or municipal officer for arbitrariness. *See* N.Y. C.P.L.R., Art. 78. Arbitrariness and irregularity, however, may also constitute strong proof of other, more secret and potentially improper motivations. The Police Commissioner, by avoiding the cleansing light of an administrative trial, and by acting contrary to the City Charter and Police Department regulations regarding police officer in probationary status, removed Walton's case from the jurisdiction of her commanding officer, and, without hearing or trial or consideration of her overall performance, dismissed Walton as a Police officer. I find that Walton's dismissal was in retaliation for the exercise of her First Amendment rights.

### V. *Remedy*

The parties agreed that issues of damages and possible other remedies would be deferred to follow any finding of liability. The parties shall therefore appear for a conference on December 15, 2000, at 10:30 a.m., to discuss such further steps as might be appropriate to lead to an entry of final judgment in this case.

SO ORDERED.